# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 20, 2014

## STATE OF TENNESSEE v. JOHNNY FRANK ROYSTON, SR.

**Appeal from the Circuit Court for Sullivan County**
**No. S58497      Robert H. Montgomery, Jr., Judge**

---

### No. E2014-00018-CCA-R3-CD - Filed January 13, 2015

---

The defendant, Johnny Frank Royston, Sr., was tried by a jury and convicted of attempted second degree murder, a Class B felony; two counts of aggravated rape, a Class A felony; especially aggravated kidnapping, a Class A felony; and aggravated kidnapping, a Class B felony. The defendant was sentenced to an effective sentence of fifty years' imprisonment. On appeal, the defendant challenges: (1) the sufficiency of the evidence, including the trial court's instructions pursuant to *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012); (2) an alleged amendment to or variance from the indictment; (3) the denial of his motion for a change of venue; (4) the "contamination" of certain evidence; (5) the trial court's alleged limits on jury deliberations; (6) alleged prosecutorial misconduct in closing arguments; and (7) cumulative error. Having conducted a thorough review of the record, we conclude that the defendant is not entitled to relief, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which DAVID A. PATTERSON, SP.J., joined. CAMILLE R. MCMULLEN, J., filed a separate concurring opinion.

Randall D. Fleming, Kingsport, Tennessee, for the appellant, Johnny Frank Royston, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Teresa Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant was indicted for attempted first degree (premeditated) murder, two counts of aggravated rape, and two counts of especially aggravated kidnapping. The offenses were charged as a result of an attack during which the victim, whose blood tested positive for several depressants that she had not voluntarily consumed, lost consciousness and awoke to find that she was tied up and the defendant was raping her and strangling her with rope. The State introduced evidence regarding the victim's physical condition after the attack, as well as testimony that the defendant had been trying to purchase drugs earlier the same day for the stated purpose of drugging a woman.

The defendant lived in a rural area, in a camper located on the property of Danny Hunt. Mr. Hunt also owned a store in the city and, above the store, an apartment that was rented to Adam Sutton and Steven White. Mr. Hunt sometimes shared the apartment with his renters and sometimes stayed at a cabin on his rural property. The cabin was some distance from the camper and was accessible by a separate drive, and the two residences were linked by a grassy road. Mr. Hunt testified that the camper that the defendant lived in was about 300 square feet.

On the Saturday prior to the assault, Mr. Hunt introduced the defendant to Mr. White at a sports bar. The next day, around lunchtime, the defendant called Mr. White and asked if he knew where to get "mickeys," "roofies," or xanax. He explained he wanted to drug a woman and take pictures of her "to give to her husband to show that she was a whore." The defendant told Mr. White, who had prior convictions for theft and for the sale of dihydrocodone, that he had gotten Mr. White's phone number from "two guys." Mr. White testified that he had been on probation at the time, was trying to "stay clean," had cut off his old friends, and did not give the defendant any drugs. Mr. White's phone records confirmed that the defendant telephoned him on August 22, 2010, at 10:21 and 10:28 a.m.

The victim, R.H.,[1] testified that she had known the defendant for about one year at the time the crimes were committed. She first became acquainted with him when her relatives allowed him to stay in a van on their property and in their garage. The victim had been in the camper that was the scene of the assault on two occasions prior to the night of the assault,

---

[1] It is the policy of this court to identify victims of sexual assault only by their initials.

helping the defendant clean in exchange for money on one occasion and cigarettes on another.

On Sunday, August 22, 2010, Mr. Hunt, Mr. Sutton, and the defendant were all at the cabin; Mr. Sutton and the defendant were doing odd jobs around the property for Mr. Hunt. The victim, who had been out of town, was on her way back to Bristol, and she spoke with the defendant on the phone regarding the possibility of cleaning Mr. Hunt's cabin or apartment for money. Accordingly, her friend dropped her off not at her home but at the end of the driveway leading to Mr. Hunt's cabin, and she walked down the driveway to the cabin. The victim was wearing white capris pants and a white t-shirt. Because she had been out of town, she carried in a plastic bag a change of clothing consisting of gray sweatpants, a gray t-shirt, a brown sweatshirt, and a windbreaker. The victim also had a pocketbook containing a phone with no minutes. When the victim arrived at the cabin, Mr. Hunt was sitting on the porch, and the defendant was assisting Mr. Sutton with repairs on the cabin. The defendant had arrived at the cabin at some point during the afternoon. Mr. Hunt testified that the victim arrived between 3:00 p.m. and 6:00 p.m., and the victim testified she arrived around 7:30 p.m. The victim had never met Mr. Hunt or Mr. Sutton, and Mr. Sutton had never met the defendant prior to that day.

While the victim, Mr. Hunt, Mr. Sutton, and the defendant were at the cabin, the victim, Mr. Hunt, and Mr. Sutton drank some alcohol. All the witnesses agreed that the defendant did not drink at all. The victim testified that she drank part of one beer and one and a half mixed drinks. The victim and Mr. Hunt testified that he mixed her one drink, and she mixed drinks for him and herself from then on. The victim testified she was drinking from a red Solo cup and that she never finished her first drink, although she "topped [hers] off" when fixing a drink for Mr. Hunt. Mr. Hunt testified they were drinking whiskey and soda, and the victim had a few drinks at the cabin. Mr. Hunt also testified that the victim had not drunk "a whole lot" at the cabin. Mr. Sutton testified that he saw the victim drink some alcohol and did not see her take any drugs. He believed she was drinking beer, and he testified they had two or three beers apiece. The victim had no visible injuries at this time.

Mr. Hunt suggested they go to a sports bar, and the defendant drove the four into town. When the victim got in the car, she put the plastic bag with her change of clothes into the trunk. The victim estimated it was between 8:30 and 9:30 p.m., Mr. Sutton estimated it was 6:00 or 7:00 p.m., and all three of the State's witnesses testified it was beginning to get dark. Mr. Sutton decided not to go to the sports bar and went home to his apartment above Mr. Hunt's store. The defendant, the victim, and Mr. Hunt went to the sports bar and sat outside. Mr. Hunt bought the victim one beer; the defendant did not drink any alcohol. Both the victim and Mr. Hunt saw other acquaintances, and the victim left her beer unattended while she greeted friends. The victim had felt fine earlier in the evening, but she began to

feel drowsy and disoriented at the bar. On the way out of the sports bar, the victim tripped on some lighting equipment. On cross-examination, Mr. Hunt explained a prior statement in which he had told detectives that he did not see her fall by noting that they had asked if she was "falling down drunk," and he had seen her trip but not fall spontaneously. The victim had not eaten all day, and the three planned to go to a restaurant. The victim was cold, put on her brown sweatshirt, and lay down in the back of the car.

Mr. Hunt testified that the defendant drove them to a restaurant, which was closing as they arrived. When he turned to ask the victim where to go, she was asleep. They went to a different restaurant, and the victim did not respond or wake when he asked her if she wanted to come inside. Mr. Hunt and the defendant left the victim in the car while they ate, and they then went back to Mr. Hunt's rural property. Mr. Hunt fell asleep during the twenty to thirty minute ride back, and the defendant woke him when they arrived at the cabin around midnight or early the next morning. Mr. Hunt had forgotten about the victim, and he left the car and went to bed.

The victim woke to find herself naked on the floor of the camper with the defendant raping her. The victim testified that she was on a pink quilt, and as she started struggling, she became aware that her arms and legs were tied with rope. The victim was face-down and could see a roll of duct tape on the floor in front of her; she also saw duct tape on her wrists. The victim had three ropes around her neck. Some of the ropes she was tied with were yellow and black, and some were white. When she tried to move, the defendant pulled on a piece of the rope around her neck, cutting off her air supply. The victim demanded that the defendant get off of her, and he told her to shut up and lie still. When she would move or tell him to get off of her, he would pull on the ropes and cover her nose and mouth with his hand, choking and suffocating her. At one point when he tried to cover her airway, she bit him. The victim was afraid she would lose consciousness and that he would kill her and she would "never see the light of day." The victim also saw an elastic cord around her wrist. She asked if he had cut it off her windbreaker, and he told her it was from a tent.

The victim asked the defendant to let her up to use the bathroom. He refused, and she ultimately defecated on the blanket. Eventually, the defendant let her up. He held her by the rope on her neck and led her to the bathroom. The defendant's camper had no running water. The victim went into the bathroom and asked the defendant for something to clean herself with. He refused to give her anything other than a dirty towel. She asked for something to wet the towel, and he handed her a coffee pot with some water in it. She poured the water on the towel, and she set the coffee pot on the bathroom counter. The defendant was standing next to her holding the rope; because of the small size of the camper, he was able to reach into the kitchen while she was in the bathroom. The bedroom was also next to the bathroom. When the defendant looked away for a moment, the victim grabbed the coffee pot

and hit him on the head, shattering the glass. The bleeding defendant fell into the bedroom; however, he held onto the rope around the victim's neck, bringing her down on top of him. The defendant was bleeding from the head. The victim began to jab the defendant in the stomach with the handle of the coffee pot. After a struggle during which the defendant was pulling on the rope and the victim was jabbing him in the stomach with the broken handle of the coffee pot, the defendant lay still for a moment. The victim tried to get up. The defendant then grabbed her throat with his left hand and began to choke her. The victim was afraid she would not be able "to walk away from there alive." The victim promised him that if he let her go, there would be no repercussions for the attack. The defendant let her go.

The victim went back to the living room, where she found several knives and a pair of scissors on the floor. She used a knife to cut the ropes from her arms and legs, and she removed the ropes around her neck by pulling them over her head. She realized that her bra was half-on, hanging from her arm, and bloody. She tried to dress in the clothing she had been wearing but realized these clothes had been cut off of her and could not be worn. The plastic bag with her change of clothes had been moved into the camper, and the victim put on her gray sweatpants and a gray t-shirt. The victim saw one of her earrings lying in a puddle of blood and put it in her ear. At that time, the defendant was using a t-shirt to wipe blood off his face. The victim ran from the camper carrying her cut-up clothing and her pocketbook.

The victim ran to Mr. Hunt's cabin, which he testified was about half a mile from the camper. She slid down a steep embankment and knocked on his door. Eventually, she was able to wake him and took shelter in the cabin. Mr. Hunt testified that the victim was shaken up and hysterical. She had blood on her bra and in her hair, and she was wearing different clothes from the night before. Her wrists and ankles had marks around them, and she had rope marks around her neck. The defendant then drove up Mr. Hunt's drive. Mr. Hunt testified that the victim started shaking when she saw the defendant coming. Mr. Hunt stepped out and told the defendant that the police were on their way and that he should leave. At the victim's behest, however, Mr. Hunt had not actually called the police. The defendant left.

Mr. Hunt and the victim drove down to the lake where he habitually went swimming in the mornings. The victim washed the blood out of her hair in the lake. A man Mr. Hunt had hired to drive him around arrived, and the three went to the camper. The victim testified there was still blood on the walls and broken glass on the floor. The handle of the coffee pot and some broken glass were tied in a plastic bag, which was outside the camper. There was a University of Tennessee t-shirt with blood on it in the tub. However, the knives, scissors, and duct tape had been moved. There were also now two folding camp chairs set up in the living room that had not been there during the attack, and the pink blanket was folded on the

couch. The victim testified that outside the camper, she saw some rope that did not match the ropes she was tied up with but also saw black rope with yellow in it and some white rope, which did look like the ropes she had been tied up with. Mr. Hunt confirmed that there was blood on the walls of the bedroom and on the bed. He saw a broken coffee pot but did not recall blood or glass in the hall. He did not see rope, scissors, knives, or duct tape. Mr. Hunt testified that the victim showed him some black electrical wiring that she said was used to tie her up. They left the wire there. Mr. Hunt took some of the defendant's property because he felt the defendant owed him money for staying in the camper. Mr. Hunt then changed the lock at the gate of the drive leading to the camper.

Mr. Hunt's driver took them to Wal-Mart, where Mr. Hunt gave the victim money to buy clothing and to buy minutes for her phone. Mr. Hunt then bought her lunch and took her to his apartment above the store around 12:00 or 1:00 p.m. The victim testified that she wanted to be somewhere the defendant could not find her. She did not feel safe going home because the defendant knew where she lived and where her parents were. The victim testified that she had asked Mr. Hunt not to call the police because she was "scared to death" of the defendant, because he knew where she might be found, and because she herself had a warrant for violation of probation and was "in no shape or condition to go to jail at that time."

The victim showered and changed clothing at the apartment. Mr. Hunt testified that the victim's wrists still had marks and that her eyes were very bloodshot, even worse than right after the assault. Mr. Sutton testified that the victim was badly beaten, bruised, and shaken and that the whites of her eyes were completely red. He thought she had on a sweatshirt and the same jeans she had worn the previous night, but he then testified he did not recall if she wore jeans when he first met her. Mr. White met the victim for the first time when Mr. Hunt brought her to the apartment. The blood vessels in her eyes were burst, and she had handprints on her neck and scrapes and bruises on her arms and legs. Mr. White gave the victim an over-the-counter pain reliever.

The victim called her mother that evening and told her mother what had happened but was afraid to reveal her location. She then spoke with her brother and agreed to meet him at a theater close by. Her brother photographed her injuries in his car at the theater. The next day, August 24, 2010, Detective Pascu called her, and her family took her to meet the detective. The detective took her to the hospital, where physical evidence was collected. The victim gave a statement to the detective and then went to her brother's home after learning the defendant was in custody. She gave a second statement to police.

The victim testified that she had prescriptions for oxycodone, tramadol, zanaflex, and valium. She last took prescription medication on the Thursday before leaving town. She did

not knowingly take any medication between the time she left town on Thursday and the rape on Monday morning. She took one prescription valium and some pain reliever while staying at Mr. Hunt's apartment on Monday. She did not knowingly take meth, darvocet, klonopin, or xanax.

The victim testified that she had been in a car accident on August 10, 2010, approximately two weeks before the assault. She had sustained a ruptured disk in her neck during the accident. She testified that the other injuries she sustained were the result of the defendant's actions. The victim testified that she lost her voice for four days and had rope marks around her neck, arms, and legs. She had bruises and abrasions on her chin, face, shoulder, arms, and legs. The victim stated that she broke off one tooth biting the defendant and had to have another pulled as well. She also sustained injuries to her eyes, including the loss of peripheral vision for two and a half weeks and extreme pain. She had to use steroids and antibiotics in her eyes daily.

The victim identified her cut up shirts, the sweatpants she put on after the attack, which were stained with feces, the stained pink blanket where the rape occurred, her windbreaker, which had been cut along the bottom, two shirts from the defendant's camper, and photographs documenting her injuries. She also identified the ropes recovered from the camper, which she stated were consistent with the ropes used to tie her arms and legs. She identified where the ropes had been cut with a knife to remove them and stated that these were not the ropes around her neck, which she had slid off and had not cut.

Susie Cusick, the nurse who treated the victim on August 24, 2010, testified that the victim had blood in her eyes, abrasions to her neck, pain in her neck, hips, legs, and forearms, and bruising to her legs, arms, and chin. She had abrasions consistent with rope around her neck. The victim was scared and upset. Nurse Cusick administered a sexual assault kit and drew blood, which she gave to law enforcement. Dr. Jonathan Wireman also noted abrasions and bruising in various places on the victim's body, pain in the victim's neck, and subconjunctival hemorrhages in her eyes. He stated that the eye injury could have been caused by strangulation or a direct blow to the face. He agreed that his report noted she had no dental injury. He testified that he noted no injuries during a pelvic exam and elaborated that a rape victim would not necessarily have such injuries.

Detective Matt Price collected evidence from the defendant's camper on August 24, 2010. Detective Price collected into evidence a pink blanket from the bed, a roll of duct tape from the closet, another roll of duct tape, a bloody t-shirt from the couch, a University of Tennessee t-shirt from the bathtub, ropes and a nylon strap, a rag from the bathroom, and broken glass along with a coffee pot handle. Detective Price testified that he did not see any knives but was not looking for them. Detective Price saw blood on the bedroom wall but did

not recall seeing blood in front of the bathroom and testified he would have photographed any blood he found. Detective Price acknowledged having moved several items of evidence while at the camper, including a blue cloth or shirt on the couch, and a chair. Detective Price agreed that police "poured some things out on the couch." He acknowledged a cushion from the couch was also moved.

Detective George Ann Pratt[2] testified that when she spoke with the victim on the phone on August 24, 2010, the victim sounded shaky, nervous, and afraid. After meeting the victim, Detective Pratt photographed the victim's injuries, including a bruise on her jaw, rope burn marks around her neck, injuries to her arms, hip, ankles, and knees, and the injuries to her eyes. Detective Pratt testified that the photographs did not capture the extent of the injuries. She also photographed the victim on subsequent days to show the duration of the injuries. Detective Pratt accompanied the victim to the hospital where a sexual assault kit, a blood sample, and the victim's clothing were collected. Detective Pratt took buccal swabs from both the victim and the defendant, and she sent the evidence to the Tennessee Bureau of Investigation "TBI" laboratories. Detective Pratt testified that the defendant had injuries to his head and a bite mark on his arm, and she photographed these. Detective Pratt testified on cross-examination that Detective Price brought the pieces of the broken coffee pot to her and she did not recall the defendant or his daughter bringing them. She testified about a second stained rag that was collected into evidence. She also acknowledged that she never visited the camper during her investigation, and waited until the week before trial to visit the site.

Two agents with the TBI testified regarding the substances found in the victim's blood. Agent Adam Gray testified that the victim's blood contained tramadol, which is a synthetic opioid, and propoxyphene, commonly known as darvocet. He testified that the victim's blood also contained a metabolite of propoxyphene. He explained that a metabolite was a substance produced by the body after ingestion of a substance and that its presence was an indicator that the propoxyphene had been ingested and there had then been a passage of time. Agent Gray testified that "mickey" and "roofie" were terms for drugs used in drug-facilitated assault and that both the drugs he found in the victim's blood could be associated with drug-facilitated assault. He testified that the drugs together would have a synergistic effect, compounding the effects of the drugs, which included drowsiness. He testified that combining drugs could mean that rather than having twice the normal effect, the drugs would be seven times as powerful. The victim's blood also contained less than .05 micrograms per milliliter of methamphetamine. The blood was sent to a different TBI laboratory for further testing. Agent April Bramlage testified that the victim's blood also contained xanax, a

_____

[2]Statements of counsel and inferences from the testimony at trial indicate that George Ann Pratt was known as George Ann Pascu at the time of the crime.

metabolite of valium and a metabolite of klonopin, all of which were nervous system depressants. Agent Bramlage also testified these drugs taken together, as well as these drugs taken with the drugs found by Agent Gray, would have a compounded effect and that alcohol would add a depressant effect. She testified on cross-examination that all the drugs were present at sub-therapeutic levels.

Agent Lisa Wessner, a serologist at the TBI testified that she identified the defendant's DNA on the bloody broken glass and the defendant's sperm on the pink blanket. She tested a nylon rope for the presence of DNA but was not able to obtain a profile; the white rope had been placed into plastic while wet and was moldy, so she did not test it because she would expect any DNA to have broken down. She testified that the pink blanket with the defendant's sperm also had a stain that looked like fecal matter, but the TBI does not test for fecal matter. Agent Wessner found no sperm in the sexual assault kit taken from the victim but explained that the presence of sperm would be affected by cleaning, urination, defecation, showering, and the passage of time. The victim's bra, which had a blood stain, contained DNA that was consistent with the victim's profile. Agent Wessner explained that she would expect to find the wearer's DNA on intimate clothing and could not determine if the DNA she obtained came from the clothing or the blood on the clothing. No DNA but the donor's was found in fingernail clippings taken from both the victim and the defendant.

Dr. Mark Bowers testified regarding the victim's eye injuries. Dr. Bowers described the victim's severe subconjunctivial hemorrhages and iritis, which is an internal inflammation that is very painful and causes light sensitivity and blurred vision. He testified the pain was typically between a five and eight on a scale of one to ten. The victim was suffering from a loss of peripheral vision, and she could have suffered vision loss without treatment. He testified that her injuries were consistent with choking or strangulation or tremendous blunt force injury. The victim was given medication, including a steroid, and returned for a follow-up visit on September 2, 2010, when she was still suffering from blurred vision and loss of peripheral vision. A CT scan taken that day was normal.

On the first day of trial, the trial court spoke to the jury about the potential duration of the proof:

> First of all I think there is a possibility that this case might go into Thursday. Does anybody have a problem on Thursday they're aware of if we have to go into Thursday? I'm just thinking that's a possibility. I don't want to because I've got a full docket, some other things, but I also don't want to wear you out as this case proceeds. You can only take so much information in a day so anyway, but there's a possibility that it

might go into Thursday so just be aware of that and let your family know that that's a possibility.

The trial continued into the Thursday mentioned by the court.

At the close of the State's proof, the defendant moved for judgment of acquittal. The trial court, concluding that the State had not established serious bodily injury, declined to charge especially aggravated kidnapping in Count 5, reducing the charge to aggravated kidnapping. The defense did not put on any evidence.

During closing argument, the State argued that it had established especially aggravated kidnapping and aggravated kidnapping based on the victim's testimony that the defendant prevented her from going to the bathroom and only eventually allowed her to go to the bathroom by leading her down the hall with a rope tied around her neck. The State noted she was confined from the time she was led down the hall until she fell into the bedroom and the defendant eventually released the rope. Regarding the rape charges, the State noted that it did not have to prove ejaculation but penetration and that the victim had testified to this element of the crime. The prosecutor, however, later stated, "Now[,] we know he penetrated her because there's semen on that blanket and there is no other explanation for it. You've heard no other proof for how it got there than what she said." The prosecution, in its final argument, noted that the victim had testified to the elements of the crimes and concluded, "[I]f you believe [the victim] beyond a reasonable doubt[,] that's all the case the State has to establish[,] if you believe her." The prosecution summarized certain aspects of her testimony, stating, "And you think about the details that she says. They all ring of credibility." There were no objections to the State's closing argument.

The trial court noted that it had added new instructions regarding whether the confinement that constituted the kidnapping was incidental to either the attempted first degree murder or the aggravated rape. The defense did not object to the instructions. The trial court instructed the jury:

> To find the defendant guilty of this offense [y]ou must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense of attempted first degree murder as charged in Count One or aggravated rape as charged in Counts Two and Three.
>
> . . . .
>
> Unless you find beyond a reasonable doubt that the

-10-

alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged attempted first degree murder in Count One or aggravated rape in either Count Two or Three and was not essentially incidental to it you must find the defendant not guilty of especially aggravated kidnapping.

The jury convicted the defendant of attempted second degree murder, two counts of aggravated rape, especially aggravated kidnapping, and aggravated kidnapping. The jury imposed fines for all convictions, and the trial court suspended all but the $25,000 fine for the attempted second degree murder conviction. The court sentenced the defendant to twelve years for attempted second degree murder, twenty-five years for aggravated rape, and twenty-five years for especially aggravated kidnapping. The trial court merged the rape convictions, merged the kidnapping convictions, and ordered the attempted murder conviction to be served concurrently with the rape conviction and the especially aggravated kidnapping conviction to be served consecutively to the rape conviction for an effective sentence of fifty years. The defendant appeals, challenging the sufficiency of the evidence, including the jury instructions regarding the kidnapping offenses; an alleged variance in the indictment; the trial court's denial of the defendant's motion for a change of venue; law enforcement's handling of physical evidence; the trial court's statements regarding the duration of the trial; the prosecutor's closing statements; and alleging cumulative error.

## ANALYSIS

### I. Sufficiency of the Evidence

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. In evaluating the sufficiency of the evidence, the court must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). This court will not reweigh or reevaluate the evidence, nor may it substitute its inferences drawn from circumstantial evidence for those of the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn.

2005). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Aggravated Rape and Attempted Second Degree Murder Convictions

The defendant was convicted of attempted second degree murder. Criminal attempt is committed when the offender, acting with the kind of culpability otherwise required for the offense,

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a) (2010). Second degree murder is "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

The defendant was also convicted of two counts of aggravated rape, one of which required the jury to find that the defendant engaged in the unlawful sexual penetration of the victim using force or coercion and that the defendant was armed with a weapon or an article used or fashioned to lead the victim reasonably to believe it was a weapon, and one of which required the jury to find that the defendant engaged in the unlawful sexual penetration of the victim accompanied by, as charged here, the finding that the defendant caused the victim bodily injury. T.C.A. § 39-13-502(a)(1), (a)(2). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(2).

The defendant challenges the sufficiency of the evidence, asserting that there was no

evidence of the crimes other than the victim's testimony.[3] Not only was there corroboration of the crimes in the form of physical evidence recovered from the camper, documented injuries to the victim, and testimony from Mr. Hunt and his two renters, but in any case, the testimony of a victim is sufficient to sustain a conviction without corroboration. *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000). The defendant also objects to the fact that the victim, citing the frayed edges of the ropes introduced into evidence, testified that they were not the ones used to choke her, which she had not cut but had slipped over her head. Contrary to the defendant's apparent claim, the State was not required to introduce the ropes used in the crime in order to obtain a conviction for attempted second degree murder. Nor is there merit in the defendant's claim that the State was required to introduce expert testimony that the marks around the victim's neck were caused by a rope. The proof at trial was that the defendant, having attempted to procure sedative drugs, was present when the victim left her drink unattended at a bar. The victim, whose blood contained drugs she denied voluntarily taking, then lost consciousness. The victim was last seen in the back seat of the defendant's vehicle. The victim testified that when she woke, the defendant cut off her air supply with a rope as he was raping her. She feared she would lose consciousness and die. The victim's neck showed rope marks, and the State introduced expert testimony that the victim's eye injuries were consistent with strangulation. A rational trier of fact could have found that, by drugging and choking the victim, the defendant acted with the intent to commit a knowing killing, and that by choking the victim with the rope to the extent that she received eye injuries, lost her voice, and had rope marks on her neck, he took a substantial step towards completing the crime. The State introduced evidence supporting each element of the crime, and the jury found each element beyond a reasonable doubt.

The defendant asserts that the aggravated rape convictions are not supported because the State did not prove penetration or, for Count 3, that the bodily injury accompanied the crime. These claims are without merit, as the victim's testimony that the defendant penetrated her is sufficient to establish penetration. *State v. Collier*, 411 S.W.3d 886, 900 (Tenn. 2013); *see Smith*, 42 S.W.3d at 106. Furthermore, the victim sustained numerous bodily injuries, including abrasions, bruising, and marks from the ropes, during the rape. The defendant's contention that some of the scrapes were sustained in her attempt to reach the safety of the cabin or as a result of the kidnapping is of no avail because even if there had not been other injuries which were sustained during the consummation of the rape (such as the abrasions on her face, bruising on her hips, and marks on her arms, legs, and throat), the statute encompasses "acts or circumstances which occur before, during and after the consummation of the unlawful sexual penetration." *State v. Locke*, 771 S.W.2d 132, 136

---

[3] The defendant's challenges regarding an alleged amendment to or variance from the indictment and regarding the jury instructions for the kidnapping offenses are addressed elsewhere in this opinion.

(Tenn. Crim. App. 1989) (upholding jury's conclusion that injuries suffered when the victim jumped from a window while the defendant attempted to reenter the house after the rape were injuries that accompanied the crime); *State v. Benjamin F. Dishman*, No. 03C01-9610-CR-00361, 1998 WL 191447, at *6 (Tenn. Crim. App. Apr. 23, 1998).

We conclude that, taking the proof in the light most favorable to the State, a rational trier of fact could have found that the State had proven the elements of the crimes beyond a reasonable doubt.

## B. Kidnapping Offenses

The defendant next challenges his kidnapping convictions based on the jury instructions. The defendant was convicted in Count 4 of especially aggravated kidnapping, which, as charged in the indictment, is the knowing removal or confinement of another so as to interfere substantially with the other's liberty accomplished with a deadly weapon. T.C.A. §§ 39-13-302(a), -305(a)(1). He was convicted in Count 5 of aggravated kidnapping, the knowing removal or confinement of another so as to interfere substantially with the other's liberty where the victim suffers bodily injury. T.C.A. §§ 39-13-302(a), -304(a)(4).

Tennessee courts have long recognized that a conviction for kidnapping that accompanies another felony may not stand if the kidnapping is essentially incidental to the other felony. *See State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991). In *State v. White*, the Tennessee Supreme Court concluded that the legislature intended "to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012). Accordingly, the court held that whether the evidence is sufficient to support every element of kidnapping is a jury question. *Id.* The *White* court replaced the prior due process test articulated in *State v. Anthony* with a sufficiency analysis. *Id.* at 578. The *White* court then held that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* Put another way, "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* The *White* court gave model jury instructions for courts to use when instructing on kidnapping offenses, which were essentially adopted by the Tennessee Pattern Jury Instruction Committee:

> To find the defendant guilty of [especially] [aggravated] [kidnapping] [false imprisonment], you must also find beyond a reasonable doubt that the removal or confinement was to a

-14-

greater degree than that necessary to commit the offense(s) of _____ as charged [or included] in count(s) _____. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

(a) the nature and duration of the alleged victim's removal or confinement by the defendant;

(b) whether the removal or confinement occurred during the commission of the separate offense;

(c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;

(d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;

(e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

(f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged _____ and was not essentially incidental to it, you must find the defendant not guilty of [especially] [aggravated] [kidnapping] [false imprisonment].

*State v. Cecil*, 409 S.W.3d 599, 607 (Tenn. 2013) (quoting 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01-.03, 8.05).

In *State v. Cecil*, the Tennessee Supreme Court elaborated that, when the jury

-15-

instructions do not follow the strictures of *White*, the failure to instruct is subject to harmless error analysis. *Cecil*, 409 S.W.3d at 610. The proper inquiry is whether the error is harmless beyond a reasonable doubt – that is, "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). The touchstone of this analysis is determining whether a rational trier of fact could interpret the proof at trial in different ways. *Id.* at 610.

For the kidnapping offenses, the trial court, following the pattern instructions, instructed the jury regarding the requirement that the kidnapping exceed the confinement necessary to accomplish an accompanying felony:

> Count Four - Especially Aggravated Kidnapping
>
> . . . .
>
> To find the defendant guilty of this offense [y]ou must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense of attempted first degree murder as charged in Count One or aggravated rape as charged in Counts Two and Three.
>
> In making this determination you may consider all the relevant facts and circumstances of the case including but not limited to the following factors:
> (a) the nature and duration of the alleged victim's removal or confinement by the defendant[;]
> (b) whether the removal or confinement occurred during the commission of the separate offense;
> (c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;
> (d) whether the removal or confinement prevented the alleged victim from summoning assistance although the defendant need not have succeeded in preventing the alleged victim from doing so[;]
> (e) whether the removal or confinement reduced the defendant's risk of detection although the defendant need not have succeeded in this objective; and
> (f) whether the removal or confinement created a

significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged attempted first degree murder in Count One or aggravated rape in either Count Two or Count Three and was not essentially incidental to it you must find the defendant not guilty of especially aggravated kidnapping . . . .

The trial court used identical language in Count 5 regarding whether the aggravated kidnapping was essentially incidental to other crimes. In his brief, the defendant does not take issue with the trial court's use of the disjunctive "or" in the instructions, but he contends that the instructions were erroneous because they failed to clarify which accompanying felony the removal or confinement of the victim was greater than necessary to achieve. Essentially, the defendant argues that the trial court should have instructed the jury that it must specify whether the removal or confinement of the victim was greater than necessary to accomplish either attempted first degree murder or aggravated rape. Although we agree that the trial court provided an erroneous instruction, we do so for a different reason than argued by the defendant.

We conclude that the jury instruction should have clarified that the confinement had to exceed that which was incidental to both the rape and the attempted homicide.[4] The purpose behind the instructions required in *White* is to "'prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery.'" *White*, 362 S.W.3d at 570 (quoting *State v. Dixon*, 957 S.W.2d 532, 534-35 (Tenn. 1997). The *White* court noted that the statute

---

[4] The following instruction would be sufficient to address any *White* issues: To find the defendant guilty of this offense, you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit [the first offense] and that the removal or confinement was to a greater degree than that necessary to commit [the second offense].

....

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged [first offense] and exceeded that necessary to accomplish the alleged [second offense] and was not essentially incidental to [the first offense or the second offense], you must find the defendant not guilty of [especially] [aggravated] [kidnapping] [false imprisonment]. *See White*, 362 S.W.3d at 580.

evinces "a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense." *White*, 362 S.W.3d at 577. If the kidnapping is essentially incidental to any accompanying offense of which the defendant is convicted, a separate conviction for the kidnapping cannot stand. In the case at bar, although the prosecutor stated in closing argument that the confinement must be greater than "necessary than that needed to commit attempted first-degree murder *and* aggravated rape[,]" the trial court's instructions included the word "or." Thus, it is possible that the jury could have read the instructions to say that it could convict the defendant if it found beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit one of the charged offenses, even if the confinement were essentially incidental to another offense.

Because we conclude that the jury instructions were in error, we undertake harmless error analysis. We conclude that the error was harmless because a rational trier of fact could not have interpreted the proof at trial in different ways. *See Cecil*, 409 S.W.3d at 610. In *State v. Hulse*, the defendant pulled the victim into his trailer where he raped and beat her. *State v. Jonathan Kyle Hulse*, No. E2011 -01292-CCA-R3-CD, 2013 WL 1136528, at *5 (Tenn. Crim. App. Mar. 19, 2013). The victim was able to escape after the rape, but the defendant followed her with a boxcutter to a nearby trailer, grabbed her ankles, and attempted to drag her away from the place where she was seeking help. *Id.* at *14. This court, accordingly, concluded that "[t]he only reasonable conclusion to be drawn from the evidence is that the Defendant's actions were well beyond that necessary to consummate the rape." *Id.* In *State v. Keller*, the defendant broke into a home to reclaim an alleged drug debt through robbery, and he held the robbery victim's family captive, threatening them with guns. *State v. Curtis Keller*, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032, at *1-2 (Tenn. Crim. App. June 27, 2013), *perm. app. denied* (Tenn. Dec. 13, 2013). This court found that the failure to give proper jury instructions was harmless beyond a reasonable doubt because the confinement lasted far longer than that necessary to achieve the aggravated assaults, which were accomplished when the family was threatened with the use of the firearms. *Id.* at *4; *see also State v. Larry Jereller Alston,* No. E2012-00431-CCA-R3-CD, 2014 WL 585859, at *3 (Tenn. Crim. App. Feb. 13, 2014) ("The common factor in these two cases was that the felony that accompanied the kidnapping charge and that gave rise to the due process concern was complete before the removal or confinement that served as the basis for the kidnapping charge."), *perm. app. granted* (Tenn. Jun. 20, 2014) ; *compare State v. Bobby A. Raymer,* No. M2011-00995-CCA-R3-CD, 2012 WL 4841544, at *7 (Tenn. Crim. App. Oct. 10, 2012) (concluding that the proof was susceptible to different interpretations when the defendants broke into the victim's home and tied the victim up after he resisted, robbing the victim after he had been restrained). *Cecil* cited the harmless error analysis in *Hulse* and *Keller* with approval. *Cecil*, 409 S.W.3d at 610.

In the case at bar, the victim's confinement was not contemporaneous with the commission of the other charged offenses. The defendant raped the victim while restraining her with the cords, and he attempted to kill the victim during the rape by choking her with the cords whenever she attempted to resist him. He then continued to confine the victim, who was tied up, well after these criminal acts. The defendant used ropes finally to lead the victim to the bathroom, and he continued to confine her by means of the ropes while she was in the bathroom. When the victim hit him with the coffee pot and attempted to escape, she was still tied up and he was still holding the rope looped around her neck, which he used to pull her down on top of him as he fell. After a period of time, the victim felt the ropes slacken and attempted to flee, and the defendant then tried to choke her with his hands. We conclude that the proof is not susceptible to different interpretations. A rational trier of fact could not have found that the defendant's acts of tying up the victim and leading her by a rope to the bathroom were essentially incidental to either the rape or the attempted second degree murder. The requirement that the kidnapping have criminal significance beyond that necessary to consummate the other offenses is "'not meant to provide the rapist a free kidnapping merely because he also committed rape.'" *White*, 362 S.W.3d at 570 (quoting *Dixon*, 957 S.W.2d at 534). Accordingly, the defendant is entitled to no relief.

## II. Indictment

The defendant challenges his attempted second degree murder conviction by asserting that there was a variance or constructive amendment to the indictment. The indictment charged that the defendant "did unlawfully, feloniously, knowingly, intentionally, and with premeditation attempt to kill another, [the victim], by choking her with a nylon cord, which conduct constituted a substantial step toward the commission of said offense." During closing argument, the prosecutor stated,

> the evidence in this case shows what the defendant intended, and what he attempted, the defendant attempted to kill [the victim] in that living room as he is suffocating her, cutting off her air. She cannot breathe with those ropes and with his hands he intends to kill her and attempts to do so. Also in the bedroom when he still has the rope around her neck and it's squeezing her and cutting off her air and then he takes his hand and squeezes to the point that he leaves fingerprints. . . .

The defendant argues that, because the indictment specified a weapon used in the crime, and because the prosecution referenced the defendant's attempt to choke the victim without (as well as with) a weapon, there was an amendment to the indictment in contravention of Tennessee Rule of Criminal Procedure 7(b).

-19-

A constructive amendment to an indictment occurs when the jury is permitted to convict the defendant based on facts that modify an essential element of the crime, and it requires automatic reversal. *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). A variance occurs when the evidence which is introduced at trial does not correspond to the elements of the offense as they are charged in the indictment. *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). The State is required to prove the crime which it charges in the indictment, and to charge the crime which it proves. *Goodson*, 77 S.W.3d at 244. In Tennessee, however, a defendant is not entitled to relief unless the variance between the indictment and the proof is both material and prejudicial to the defendant. *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). "[A] variance is not fatal if (1) the defendant is sufficiently informed of the charges levied against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds." *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993).

If a fact that was gratuitously alleged in the indictment is not proven at trial, the surplusage raises an issue of variance. *March*, 293 S.W.3d at 588-89. "[H]owever, an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged." *Id.* at 588. The defendant was charged with the attempt to commit first degree premeditated murder. This crime does not require the use of a weapon, and accordingly the reference to the nylon cord was surplusage. *See State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996) (concluding that jury's verdict should not have been set aside when the indictment charged rape by fellatio but victim testified to a different sexual penetration).

Here, there was no variance because even though the indictment contained surplusage, the State introduced evidence that a nylon cord was used in the crime. Neither was there a constructive amendment modifying an essential element of the crime. The jury was instructed regarding criminal attempt and regarding the elements of first degree murder, as well as the elements of the offense of which he was convicted, attempted second degree murder. The jury found that all the elements of the crime had been met. The defendant was informed of the charges sufficiently to allow him to prepare for trial, and the indictment provides a basis to protect the defendant against subsequent prosecution for the same crime. He is therefore not entitled to relief.[5]

---

[5]The defendant does not argue that the State was required to elect between the choking with the ropes in the living room and the choking with his hands in the bedroom in order to assure juror unanimity on the attempted homicide charge. *See State v. Johnson*, 53 S.W.3d 628, 630-31 (Tenn. 2001). "Questions regarding jury unanimity generally arise in cases where the prosecution presents evidence to the jury that tends to show more than one criminal offense, but

## III. Venue

The defendant also challenges the trial court's denial of a motion for a change of venue. The defendant urges that this denial was plain error. The State counters that this court must presume that the trial court correctly denied the motion in the absence of a transcript of the hearing or of the voir dire. The defendant's designation of the record requested the entire transcript of the records and proceedings of his jury trial. However, the defendant failed to ensure that the record contained a complete transcript, as the record contains the defendant's motion for a change of venue but no order, transcript of a hearing, or other reference to the issue prior to the motions for a new trial. The appealing party bears the burden of preparing a proper record for the consideration of the appellate court. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). This includes preparing "a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). The record before us simply contains no basis to evaluate the defendant's claim that the denial of his motion was error, and accordingly, we presume that the rulings of the trial court were correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

## IV. Contamination of Evidence

The defendant next objects to the fact that items at the crime scene were moved around by the victim and Mr. Hunt and by law enforcement. The defendant includes no legal argument and not a single citation to legal authority. The evidence at trial was that the defendant had rearranged the contents of the trailer prior to the visit by the victim and Mr. Hunt and that the defendant had removed some items. The victim and Mr. Hunt then moved items around and removed some of the camper's contents. Finally, law enforcement testified that some of the items in the photographs were not in their original locations. It is unclear from the defendant's brief, however, if he is claiming that there was a failure of authentication, that there was a problem with the chain of custody, or that evidence was lost or destroyed. *See, e.g., State v. Cannon*, 254 S.W.3d 287, 298 (Tenn. 2008) (concluding chain of custody was not established when pantyhose were not identified as belonging to the victim); *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999) (analyzing destruction of evidence which was alleged to have been exculpatory). Although the defendant asserts that the evidence was "contaminated," he does not explain how the evidence allegedly changed, nor does he allege exculpatory evidence was lost or destroyed. Accordingly, this issue is

---

the underlying indictment is not specific as to the offense for which the accused is being tried." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Noting that the indictment here specified that the defendant used ropes in the attempted homicide, we decline to address the issue.

waived, and we will not consider it.

## V. Limit on Duration of Trial

The defendant claims that his due process right was infringed upon when the trial court addressed the jury during trial about the possible length of the proceedings. The State notes that the defendant did not lodge a contemporaneous objection and that the issue is therefore waived. The remarks the defendant finds objectionable are:

> All right, ladies and gentlemen[,] I think we're going to go ahead and stop for the day and I need to tell you several things here. First of all[,] I think there is a possibility that this case might go into Thursday. Does anybody have a problem on Thursday they're aware of if we have to go into Thursday? I'm just thinking that's a possibility. I don't want to because I've got a full docket, some other things, but I also don't want to wear you out as this case proceeds. You can only take so much information in a day so anyway, but there's a possibility that it might go into Thursday so just be aware of that and let your family know that that's a possibility.

After these remarks, the trial court specifically asked the parties if they would like other instructions before the jury was released for the night, and both answered in the negative. The defendant claims that the statement about the trial court's preference that the trial finish prior to Thursday was tantamount to setting a limit on the length of the trial. *See State v. Lee Turner*, No. M2005-02749-CCA-R3-CD, 2007 WL 845894, at *12 (Tenn. Crim. App. June 25, 2007) (McLin, J., dissenting) (noting that it was error to impose a deadline on deliberations). At the hearing on the motion for a new trial, the trial court found that it had not limited the duration of the trial, citing the fact that the trial in fact lasted into the Thursday which the defendant alleged fell outside the time limit. We conclude that the State is correct that the issue is waived. Moreover, the record supports the trial court's determination that it was merely preparing the jurors for the possibility that they might be away from home longer than expected, and the record also supports the determination that no limitation was set on the duration of either the trial or jury deliberations. Accordingly, the defendant is entitled to no relief.

## VI. Prosecutorial Misconduct

The defendant next objects to three statements made by the prosecution during closing arguments. The State asserts that this argument is waived for failure to lodge a

contemporaneous objection, and the defendant asks us to review for plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Plain error requires the court to find that:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The reviewing court need not consider all factors if it determines that at least one cannot be established. *State v. Nance*, 393 S.W.3d 212, 228 (Tenn. Crim. App. 2012).

The "clear and unequivocal rule of law" which the defendant asserts was breached consists of certain statements made during closing argument by the prosecutor. In closing argument, misconduct may fall into one of the following categories:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

-23-

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted). When a prosecutor's argument falls into an area of proscribed conduct, the error becomes the basis for reversal only if "the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Id.* at 5.

The defendant objects to three statements made by the prosecution. During the State's rebuttal in closing argument, the District Attorney General referenced the Assistant District Attorney General's initial closing argument: "Ms. Nelson is right, if you believe [the victim] beyond a reasonable doubt[,] that's all the case the State has to establish[,] if you believe her." The defendant appears to argue that this statement is vouching for the credibility of the victim. However, the plain words of the statement submit the issue to the jury. Because the victim testified to facts supporting each of the elements required to convict the defendant of the crimes charged, this is not misconduct but instead an accurate statement of the law.

The defendant also objects that the prosecutor was expressing a personal belief regarding the verity of the victim's testimony when he stated, "And you think about the details that she says. They all ring of credibility." The prosecution then pointed to certain details in the victim's testimony, such as the earring on the floor and the dirty rag, and referred the jury to the physical evidence which would be taken back to the jury room as corroboration of the victim's testimony. The jury was correctly instructed that it was the arbiter of issues of witness credibility. In our opinion, the prosecutor's statement falls short of expressing a personal belief. The Tennessee Supreme Court has noted that it is proper to point to "specific evidence which tended to" reflect on witness credibility. *State v. Sexton*, 368 S.W.3d 371, 420 (Tenn. 2012). Here, the prosecution was highlighting favorable evidence at trial in order to allow the jury to draw inferences regarding credibility. Accordingly, this statement did not constitute reversible error.

The defendant next objects to the prosecutor's statement regarding the presence of semen on the blanket. In closing, the prosecutor stated, "Now[,] we know he penetrated her because there's semen on that blanket and there is no other explanation for it. You've heard no other proof for how it got there than what she said." The presence of semen is, of course, not proof of penetration, although it would lead to the inference that sexual activity took place. The prosecutor's statement could therefore be viewed as a misstatement of the inferences to be drawn from the evidence. *See Goltz*, 111 S.W.3d at 6. However, viewing the statement in the context of the case, we conclude that the defendant is not entitled to relief. Prejudicial impact can be measured by considering:

(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case

*Id.* at 5-6. The facts and circumstances of the case establish, as the prosecution noted, no alternative explanation for the presence of feces and sperm on the blanket. No curative instructions were requested. During the first part of the prosecution's opening statement, the Assistant District Attorney General outlined the elements of each offense, including that the State had to establish sexual penetration. The Assistant District Attorney General continued, "[The victim] testified that the defendant penetrated her vagina with his penis repeatedly. Although [the element] doesn't require that the State prove the emission of semen[,] we have proven that the defendant's sperm was on that pink blanket." Considering the statement in the context of the entirety of closing arguments, we conclude that the prosecution was arguing that the presence of semen and feces on the blanket corroborated the victim's statements regarding penetration. The jury instructions correctly charged the jury that it must find penetration as an element of the offense. The case against the defendant was particularly strong.

We conclude that even if the statement were error, it was not "so improper or . . . so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5. Furthermore, we cannot say it adversely affected a substantial right of the accused or that rectification of the mistake would be necessary to do substantial justice. *See Smith*, 24 S.W.3d at 282. The defendant is not entitled to relief.

## VII. Plain Error in Jury Instructions for Aggravated Rape in Count 2

We are constrained to note that, in the transcript of the jury instructions included on appeal, no mens rea instruction is given on Count 2, the first aggravated rape count. The transcript of the oral instructions for Count 2 reads:

> Any person who commits the offense of aggravated rape is guilty of a crime. For you to find the defendant guilty of this offense the state must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant had unlawful sexual penetration of the alleged victim; and
> (2) that the defendant caused bodily injury to the alleged victim.

-25-

If you find the defendant guilty beyond A reasonable of aggravated rape you may fix a fine in an amount not greater than $50,000.00.

Although the trial court's oral jury instructions are included, the written jury instructions are not part of the record. It is therefore not apparent that the record clearly establishes what happened in the trial court. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). In any case, "[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005). Where the omitted element is uncontested and supported by uncontroverted evidence or where the omitted element is necessarily found by the jury, the error may be harmless beyond a reasonable doubt. *See State v. Ducker*, 27 S.W.3d 889, 899-900 (Tenn.,2000); *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002) (noting that "harmless error is not limited to cases in which the verdict *necessarily* included a finding on the omitted element"). The jury found the defendant guilty of aggravated rape in Count 3, which instructed the jury that, in order to convict, it must find that the defendant had acted intentionally or knowingly.[6] Accordingly, the jury necessarily found that the defendant possessed the requisite mens rea when he committed the rape. In any event, Count 2 and Count 3 were merged. Accordingly, we conclude that any error was harmless beyond a reasonable doubt.

## VII. Cumulative Error

The defendant, in his reply brief, alleges that cumulative error entitles him to a new trial. In rare circumstances, the cumulative effect of errors at trial may affect the fairness of the proceedings and entitle the defendant to relief. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2012). Having considered the factors outlined in *Hester*, we conclude that the cumulative effect of any errors did not deprive the defendant of a fair trial.

## VII. Conclusion

Based on the foregoing reasoning, we affirm the judgment of the trial court. However, we note that the judgment forms for Count 3, aggravated rape, and Count 5,

---

[6]We note some courts have found that recklessness is a sufficient mental state to support aggravated rape. *State v. Hood*, 221 S.W.3d 531, 546 (Tenn. Crim. App. 2006); T.C.A. § 39-11-301(c); *but see State v. Womack*, No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at *9 (Tenn. Crim. App. Jan. 4, 2005) (concluding that the definition of "reckless" in Tennessee Code Annotated section 39-11-302 clarifies that recklessness can only apply to result-of-conduct offenses or the circumstances surrounding an offense).

aggravated kidnapping, do not list the conviction offenses; instead, the words "merge with count 2" and "merge with count 4" appear in the space where the conviction offense should be written. The record reflects that the defendant was convicted of aggravated rape and aggravated kidnapping in these counts. We remand for correction of this form.

_____
JOHN EVERETT WILLIAMS, JUDGE